

SEALED

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

OCT 12 2018

JULIA C. DUDLEY, CLERK
BY: *J. Clark*
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
### for the
Western District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

4 GB SCANDISK THUMBDRIVE
2 GB SCANDISK THUMBDRIVE
HP LAPTOP with S/N 5CG6163W3b

)
)
)
)
)
)

Case No. 1:18 mj 160

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____ Western _____ District of _____ Virginia _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 USC 242; 18 USC 666 | Deprivation of Rights Under Color of Law; Program Fraud/Bribery; Obstruction of |
| 18 USC 1512 (b) | Justice; Witness Tampering and Inducing the Destruction of Evidence; False, |
| 18 U.S.C. 1001(a)(2) | fictitious, or fraudulent statement or representation to the US Government. |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Micah J. Childers, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/12/18

*Pamela Meade Sargent*
*Judge's signature*

City and state: Abingdon, Virginia

Hon. Pamela Meade Sargent, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

IN THE MATTER OF THE SEARCH OF: )
4 GB SCANDISK THUMBDRIVE )
2 GB SCANDISK THUMBDRIVE )
HP LAPTOP with S/N 5CG6163W3b )

**UNDERSEAL**

Case No._____

**AFFIDAVIT**

1.    I, Micah J. Childers, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

2.    I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for the offenses enumerated in Section 2516 of Title 18, United States Code.

3.    I have been employed as a Special Agent with the FBI for approximately 8 years. I am currently assigned to the Richmond Division, Bristol Resident Agency (BRA), located in Bristol, Virginia. Prior to working in the BRA, I was assigned to the Atlanta Division, Rome Resident Agency (RRA), located in Rome, Georgia, and was the coordinator for the Northwest Georgia Criminal Enterprise Task Force, an FBI Safe Street Task Force, investigating violent crimes, illegal narcotics trafficking, and illegal gang activity. I have served as the case agent on multiple terrorism investigations, to include a domestic terrorism investigation involving explosive devices. I have taken part in numerous federal, state, and local investigations concerning international and domestic terrorism, document and identity fraud, financial fraud, cybercrimes, controlled substance violations, public corruption, civil rights violations and firearms offenses.

1

4.     The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show simply that there is sufficient probable cause for the requested search warrant and does

not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that

evidence of a violation of 18 U.S.C. § 242 (deprivation of civil right); 18 U.S.C. 666 (program

fraud and bribery); 18 U.S.C. § 1001(a)(2) (makes any materially false, fictitious, or fraudulent

statement or misrepresentation); and 18 U.S.C. §1512(c)(whoever corruptly – (1) alters, destroys,

mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to

impair the object's integrity or availability for use in an official proceeding; or (2) otherwise

obstructs, influences, or impedes any official proceeding, or attempts to do so); will be located in

a 4GB Scandisk Thumbdrive, a 2GB Scandisk Thumbdrive, and an HP Laptop with serial

number 5CG6163W3B.

### STATEMENT OF PROBABLE CAUSE

6.     On August 3, 2018, Investigators interviewed confidential witness one (CW1).  CW1

provided the following information:

> Following a 2016 arrest for shoplifting in Tazewell County, Virginia, CW1 was
> opened as a confidential informant for Shade Workman, Virginia State Police
> Special Agent and Commander of the Drug Task Force located in Tazewell
> County, Virginia. Workman instructed CW1 words to the effect that no matter
> how many busts you do, five or five hundred, if you want to be with your kids,
> you are going to do this my way. Over the next year, Workman and CW1 had sex
> six times immediately before or after CW1 purchased illegal drugs at the direction
> of Workman, and at least ten times outside of CW1's work for the task force. In
> April of 2017, CW1 was released from incarceration in Tazewell County with the
> stipulation requiring CW1 assist Drug Task Force operations. CW1 moved from
> the area, due to the fear that CW1 would again be required to have sex with
> Workman.

2

7.      On August 6, 2018, confidential witness two (CW2) was interviewed. CW 2 provided the

following information:

> In the beginning of May, 2017, CW2 gave a ride to witness one (W1, W1 has not
> yet been interviewed by law enforcement due to concerns of potential destruction
> of evidence and witness tampering) who claimed to be having sex with a cop.
> When CW2 arrived at the location provided, W1 exited CW2's vehicle and
> entered a grey truck. CW2 observed the male who was driving the grey truck, as
> the driver's side window was down. In December 2017, CW2 was arrested, for an
> outstanding warrant for the distribution of illegal drugs, during a law enforcement
> round-up. CW2 was brought into an interview room, where only Workman was
> present. CW2 recognized Workman as the driver of the truck from May 2017.
> Workman told CW2 the charges filed against CW2, and asked if CW2 knew who
> got CW2, meaning who had worked as a confidential informant when CW2 sold
> illegal drugs. CW2 said," Yes, absolutely. You're fucking her." Workman
> instructed CW2 that CW2 cannot touch the confidential informant, and that the
> confidential informant is protected like the police.

8.      On August 7, 2018, confidential witness three (CW3) was interviewed. CW3 provided

the following information:

> In 2016, CW3 was arrested for shoplifting. After the arrest, CW3 was approached
> by Workman to work for the drug task force. CW3 signed up with the drug task
> force in order to receive credit in sentencing. Workman requested to meet CW3.
> Workman arrived at the meeting alone, and CW3 believed that Workman was
> trying to set up CW3 on other charges. Subsequent meetings resulted in Workman
> having sex with CW3 in Workman's police issued vehicle and in the drug task
> force office space. In August of 2016, Workman also met CW3, at the Super 8
> Hotel located in Richlands, Virginia, for the purpose of having sex with CW3. On
> other occasions, Workman sent CW3 pictures of himself and requested that CW3
> send naked pictures to him. Workman instructed CW3 that if CW3 told anyone
> about their sexual relationship that any credit received for CW3's work with the
> drug task force would go away, and CW3 would go back to jail. During August of
> 2016, CW3 accidently broke the screen of CW3's cellphone. CW3 had texted
> with Workman using this cellular device, and had sent and received pictures from
> Workman of a sexual nature.

3

9.     On August 7 and 8, 2018, CW3 cooperated with law enforcement to send and receive text messages from CW3's cellular device to (276) 613-3680, known to CW3 as the work cellphone utilized by Workman. During the text conversation, CW3 is instructed to retrieve the previously broken cellphone, and dispose of the cellphone at CW3's workplace. These text messages are included as Attachment C.

10.     On August 8, 2018, records obtained from the Super 8 Hotel located in Richlands, Virginia showed that on August 24, 2016, Shade Workman rented a room from the hotel and utilized a Mastercard for the payment of the hotel room.

11.     On August 10, 2018, CW3 made a consensually recorded telephone call from CW3's cellular device to (276) 613-3680. Workman answered the telephone, and spoke with CW3. CW3 confirmed that the cellphone had been disposed of as previously directed.

12.     On August 13, 2018, Workman was interviewed by Special Agent Micah Childers of the FBI at Workman's office located in Tazewell County, Virginia. The purpose of the interview was to further an investigation related to potential violations of 18 U.S.C. § 242, namely deprivation of civil rights, related to Workman's relationships with confidential informants.

13.     During the interview of Workman, he was asked if he had ever had an inappropriate relationship with any confidential informant, and he answered "No." Workman was asked if he had ever had sex with a confidential informant, and he answered "No." Workman was asked if he had ever directed a confidential informant to dispose of any evidence, and he answered "No." This interview was both audio and video recorded.

14.     CW1, W1, and CW3 were positively identified as having been opened as confidential informants by Virginia State Police. Once open as a confidential informant, Virginia State Police records the status of the confidential informants as active or inactive, and does not officially

close a confidential informant. CW1 and CW3 were listed as active confidential informants during the time of the alleged sexual activity.

15.     Virginia State Police confirmed that the cellular telephone with telephone number (276) 613-3680 is a telephone owned by the Virginia State Police and is assigned to and utilized by Workman.

16.     On August 21, 2018, the United States District Court issued an arrest warrant for a violation of 18 U.S.C. §. 1001(a)(2) based upon a criminal complaint.

17.     On August 22, 2018, law enforcement officers initiated surveillance of Workman's residence in Bluefield, Virginia at approximately 7:30 a.m. At approximately 8:00 a.m., Special Agent Micah Childers notified Bluefield Police Department that an arrest of Workman would likely be taking place in the parking lot of the Bluefield Police Department. Shortly after this notification was made to the Bluefield Police Department, Workman was observed leaving his residence with a bag in his possession which he placed in his vehicle. Workman then re-entered his residence where he remained for a few minutes and then exited his residence and got into his vehicle and left the location. At this time, Agent Childers called Workman's personal cell phone and notified him of the issuance of the federal arrest warrant and asked to meet Workman in Tazewell, Virginia, so that Workman could be taken into custody. Workman agreed to meet Agent Childers and suggested the Magic Mart located in Tazewell, Virginia, which is located directly off of Route 460.

18.     Following this phone call, Workman was observed traveling on Route 460 at a high rate of speed, in excess of the posted speed limit. Workman was followed to an apartment bearing the address 130 Hokie Lane, Apartment #2, Tazewell, Virginia. In order to travel to 130 Hokie Lane, Apartment #2, Workman had to deviate from the most logical line of travel to the Magic Mart in

5

Tazewell, Virginia. Workman was observed taking the aforementioned bag into the apartment and exiting the apartment without the bag in his possession. Workman then traveled to the Magic Mart, where he was taken into custody by law enforcement.

19.     The United States District Court issued a search warrant for 130 Hokie Lane, Apartment #2, Tazewell, Virginia.

20.     Agents of the FBI executed the warrant to search 130 Hokie Lane, Apartment #2, Tazewell, Virginia. During the search of the residence, the aforementioned bag was located. The bag contained items that appeared to be related to Workman's employment with the Virginia State Police, to include one 2GB Scandisk Thumbdrive, one 4GB Scandisk Thumbdrive, and one HP Laptop with serial number 5CG6163W3B. These three items were seized as evidence. Also observed in this bag containing these items were a Virginia State Police Bridge Pass, receipts related to purchases of controlled substances by law enforcement, and a door card to access Virginia State Police facilities.

21.     This affiant is aware that electronic data is easily transferred from cellular devices to computers and other electronic storage media to include thumbdrives. This affiant is also aware that applications used to send electronic messages between cellular devices can also be accessed using computers and the internet.

22.     It is known to this affiant that the Virginia State Police maintains records, documents, photographs, and other data related to confidential informants in electronic format on computer systems.

23.     It is also known to this affiant that the Virginia State Police received funds from the United States Government in excess of $10,000.00 in the years 2015 and 2016.

24.     This affiant is aware that intangible things and actions, e.g. sexual acts, have been determined to be things of value as referenced in 18 U.S.C. § 666.  *See United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979); *United States v. Kulla*, 434 F. App'x 268 (4th Cir. 2011).

25.     Tazewell County, Virginia is located in the Western Judicial District of Virginia.

## Terms and Definitions

26.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

27.     Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

28.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the items listed in Attachment A, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29.     I submit that there is probable cause to believe those records will be stored on the items in Attachment A, for at least the following reasons:

7

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

8

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

30. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the items listed in Attachment A because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United

9

States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The

existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

31. *Nature of examination.* The review of the items listed in Attachment A may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

32. Based on the aforementioned factual information and my training and experience in criminal investigations, I submit there is probable cause to believe that there is evidence of a violation of 18 U.S.C. § 242 (deprivation of civil right); 18 U.S.C. 666 (program fraud and bribery); 18 U.S.C. § 1001(a)(2) (makes any materially false, fictitious, or fraudulent statement or misrepresentation); and 18 U.S.C. §1512(c)(whoever corruptly – (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so); will be located in a 4GB Scandisk Thumbdrive, a 2GB Scandisk Thumbdrive, and an HP Laptop with serial number 5CG6163W3B.

FURTHER THE AFFIANT SAYETH NOT

Respectfully submitted,

Special Agent MICAH J. CHILDERS
Federal Bureau of Investigation

Subscribed and sworn to before me on _October 12_, 2018

Honorable PAMELA MEADE SARGENT
United States Magistrate Judge

13

## ATTACHMENT A

## ITEMS TO BE SEARCHED

The following items were seized during the execution of a search warrant at 130 Hokie Lane, Apartment #2, Tazewell, Virginia:

1)     One black, 2 GB, Scandisk Thumbdrive.
2)     One black, 4 GB, Scandisk Thumbdrive
3)     One black, HP Laptop with serial number 5CG6163W3B

## ATTACHMENT B

## ITEMS TO BE SEIZED

**Evidence relating to violations of 18 U.S.C. § 242 (deprivation of civil right); 18 U.S.C. 666 (program fraud and bribery); 18 U.S.C. § 1001(a)(2) (makes any materially false, fictitious, or fraudulent statement or misrepresentation); and 18 U.S.C. §1512(c)(whoever corruptly – (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so), specifically:**

1) Electronic data, including records, documents, and other electronic items relating to Shade Workman's communications with or associations with confidential informants and individuals being investigated by Shade Workman or the Tazewell County Drug Task Force.

2) Electronic data, including records, documents, pictures, videos, or other electronic items, evidencing official action by Shade Workman in regards to confidential informants and/or sexual relationships with confidential informants and individuals being investigated by Shade Workman or the Tazewell County Drug Task Force.

3) Electronic data, including records, documents, pictures, videos, or other electronic items, evidencing attempts to obstruct justice, coerce witnesses, or destroy evidence.

4) Electronic data, including receipts and other documentation relating to payment for hotel rooms or financial documents related to credit card accounts held by Shade Workman.

5) For any computer or storage medium whose search is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

6) As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies). The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## <u>Attachment C</u>

## Text Messages

1) The following text conversation was observed by law enforcement and conducted by CW3 on

August 7, 2018, between CW3's cellular device and telephone number (276) 613-3680:



(276) 613-3680

Hey

Been busy as always

I think we might have a problem

What's that

Remember my phone that I
busted ▓ charged and the
damn thing came on and shade
I still had pics of u on it

He's flipping out on me

Still

It's been almost three years





**TFW LTE** 5:48 PM

(276) 013-3680

Yeah don't need to mess all the credit up

Hopefully he want

I told him wh... ...ll ...ppen to me if he did I th... ...ally hurt him i guess idk...

Hopefully he won't do that

What if we can make sure he don't have the phone

Well get it

He won't tell me where it is I think he has it at work

Oh ok

U want to buy it from him to shut him up lol

iMessage



TFW LTE     5:43 PM

(276) 613-3680

> U want to buy it from him to shut him up lol

What?

Blackmail

> U know anything on him

No

> Well what are we going to do I'm not going back to jail I'm worked to hard for where I am now

I'm not sure
Hopefully he won't do that to you

> I think he's serious

U know what's on that phone

iMessage



**(276) 613-3680**

U know what's on that phone right.......... EVERYTHING

I know!

I don't know what to do then

I don't want everyone in the courthouse seeing my naked ass

Yeah no shit

If they come to talk to me what am I supposed to say

I'm sorry u know how I trip out

It's up to you
I'm stressed out now

Ur stressed I live with him and my kids are hearing the shit

iMessage



all TFW LTE      5:49 PM

(276) 613-3680

I don't know what to do then

> I don't want everyone in the courthouse seeing my naked ass

Yeah no shit

> If they come to talk to me what am I supposed to say

> I'm sorry u know how I trip out

It's up to you
I'm stressed out now

> Ur stressed I live with him and my kids are hearing the shit he's saying to me ▮▮▮▮ even asked me who is shade mommy

Delivered

I'm sorry

iMessage

2) The following text conversation was observed by law enforcement and conducted by CW3 on August 8, 2018, between CW3's cellular device and telephone number (276) 613-3680:



iMessage
Today 11:12 AM

Hey I found the phone in the truck last night he's got to be so pissed 😫 when he finds out it's gone what should I do with it now

Oh lord. Tell him you aint seen it

Well I don't want him to find it

Throw it away I guess

Take it to work and throw it

Should I delete it first how do I get the shit off the cloud or whatever

I don't know nothing about cloud stuff?

iMessage


I'm an idiot when it comes to cell phones to be honest

I said there ain't no back up on it if no sd card

Ok sheewwww

Are u sure

I guess delete it and throw it away

Like at work or something

You still manager at Wendy's?

No I got a new job asst manger at the store

What store

Fast mart

iMessage



How's the boys? Probably 6 foot tall by now lol

They are good getting so big and they have my mouth and attitude poor kids they are in for it lol

Oh hell!
Playing football this year?

No I don't think so maybe basketball though

Middle school?

It hasn't been that long dumbass 3rd and 2nd

**Delivered**

Lol 😂
I'm old remember

Time flies the older you get!

  iMessage 

      



Playing football this year?

> No I don't think so maybe basketball though

Middle school?

> It hasn't been that long dumbass 3rd and 2nd

Lol 😅
I'm old remember

Time flies the older you get!

> Yeah u r old

> Haha

Delivered

My hair is getting gray and gray

You looked amazing tho

iMessage

Case 1:18-mj-00160-PMS   Document 1   Filed 10/12/18   Page 29 of 32   Pageid#: 29



Middle school?

It hasn't been that long dumbass 3rd and 2nd

Lol 😄
I'm old remember

Time flies the older you get!

Yeah u r old

Haha

My hair is getting gray and gray

You looked amazing tho

I'll message u back after work k

Delivered

iMessage





(276) 613-3680

Are u busy

Training new guy

Can u talk

Not at the moment

Can I call u tmrw i'm heading home now just wanted to talk for a min

Yes
You working tomorrow

No I have to take █████ mom to doc in Abington

Delivered

Ok well holler at me tomorrow

Be careful